UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE

Dennis Palmerini

     v.                                    Civil No. 12-cv-505-JD
                                                   Opinion No. 2014 DNH 152
Fidelity Brokerage
Services LLC


O R D E R

Dennis Palmerini brought suit against Fidelity Brokerage
Services LLC, alleging claims of discrimination under Title I of
the Americans with Disabilities Act ("ADA"), 42 U.S.C. §
12112(b)(5), and negligent and intentional infliction of
emotional distress.[1]  Fidelity moves for summary judgment on the
remaining claims and also asks the court to decline supplemental
jurisdiction over the state claims.  Palmerini objects to summary
judgment.  Palmerini also moved for additional time to comply
with the orders issued on March 20, 2014, and May 16, 2014, and
Fidelity has not objected to that motion.


I.  Motion for an Extension of Time

Fidelity moved to compel Palmerini to produce his medical
records and documents related to his current employment.  The
motion was granted.  See Doc. no. 30, Feb. 4, 2014.  Pursuant to
Federal Rule of Civil Procedure 37(a)(5)(A), Fidelity was

_____

[1]Palmerini's claim under RSA 354-A:7 was previously
dismissed, and Fidelity was granted judgment on the pleadings on
Palmerini's wrongful constructive discharge claim.

entitled to an award of attorneys' fees incurred in making the motion, and the court granted Fidelity's motion on March 20, 2004.  See Doc. no. 36. Fidelity was awarded $2,823.75 to be paid by Palmerini's counsel.

On May 16, 2014, counsel for Palmerini moved for clarification of the order awarding attorneys's fees concerning the deadline for compliance with the order.  On the same day, the court ordered the fees to be paid within ten days.  On May 27, counsel for Palmerini filed a motion to extend time for compliance with the order to June 17, 2014.  Fidelity did not file a response to the motion for an extension of time.

Because June 17, 2014, has passed, the award of fees should now have been paid.  If not, counsel for Palmerini, Darlene M. Daniele, shall pay the amount of the award, $2,823.75, **on or before July 20, 2014.**


II.  Motion for Summary Judgment

Summary judgment is appropriate if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A party opposing summary judgment "must set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986). Material facts are "facts that might affect the outcome of the suit under the governing law."  Id. at 248.  The court considers only the undisputed material facts and takes all reasonable

inferences from those facts in the light most favorable to the
nonmoving party.  <u>Avery v. Hughes</u>, 661 F.3d 690, 693 (1st Cir.
2011).

In this case, "Palmerini accepts the [sic] Fidelity's
Statement of Undisputed Facts, (Motion for Summary Judgment, pp.
4-12) to the extent that the facts are recited, but not to the
extent that the captions describe those facts, nor to the extent
that Fidelity has implied that any conclusions and/or inferences
should be drawn from those facts."  Pl. Mem. in support of Obj.
to Sum. Judg. doc. no. 39, at 1 n.1.  Therefore, the court will
rely on the facts provided by Fidelity in its statement of
undisputed facts, excluding the section headings, under the
summary judgment standard.


A.  <u>Background</u>

Dennis Palmerini began working at Fidelity in May of 2007 as
a financial services representative.  He later became an
investment consultant, and in 2008 he took a position in
"proactive retail outbound sales."  In late 2009, during business
restructuring at Fidelity, Palmerini was moved to the position of
Retirement Solutions Representative ("RSR").

In January of 2010, Palmerini applied for and was
transferred to a job in Retirement Investment Services Proactive
("RIS"), as a Retirement Representative IV.  In that job,
Palmerini was responsible for calling customers who had 401(k)
accounts with Fidelity to talk with them about their options with

respect to those accounts.  Performance at RIS was measured by the number of customers called, referred to as "dials", and the assets moved to Fidelity from the customers that the representative had contacted, referred to as "rollovers".

During his deposition, Palmerini acknowledged that he had both a low dial rate and a low rollover rate.  His colleagues had better numbers, and he knew that his performance was lacking compared to others and was not adequate.  His supervisors told him to make more calls.

From January to July of 2010, Palmerini reported to Brian Hash.  Palmerini contends that Hash mistreated him by questioning everything Palmerini was doing, bothering him, micromanaging him, telling him that his remarks were inappropriate, telling him that the managers thought Palmerini was a corporate spy, and having mostly negative meetings with him.  Palmerini stated that when he offered to provide a synopsis of a meeting for Hash, Hash responded that Palmerini would make him happy by dialing customers and having conversations that resulted in rollovers, which Palmerini likened to throwing a knife at him.  Palmerini found that his colleagues had had similar experiences with Hash. He also recounted that many of his colleagues were negative, complained about everything, and created a toxic working environment.

In July of 2010, Palmerini began reporting to Chris Znoj. Palmerini continued to have poor performance with low numbers of dials and rollovers.  Palmerini contends that Znoj also

mistreated him by lying, constantly calling meetings, asking him about how he spent his time without first doing proper research, interfering with Palmerini's efforts to speak at meetings, not understanding Palmerini's experience, and becoming boisterous, loud, demonstrative, and angry.  Palmerini's colleagues said that Znoj treated them the same way.

Znoj reported in September of 2010 that Palmerini responded to feedback by becoming defensive, telling Znoj that he "did not know what the f*** he was talking about."  Palmerini denied making that statement.  Palmerini contends that Znoj's report of that incident sent him "over the edge" and caused him to be unable to think straight, to be incapable of functioning, and to be unable to do his job.

The day after that incident, Palmerini sent Znoj an email to inform him that he would not attend a team meeting because he could not be in Znoj's presence.  Palmerini also ordered Znoj to communicate with him only through email or another employee. Palmerini believed that he had "human authority" to direct his supervisor.  Znoj told Palmerini he was being insubordinate and told him to attend the meeting.  Palmerini refused to attend the team meeting.  When a human resources representative attempted to arrange a meeting with Palmerini and Znoj to discuss Palmerini's concerns, Palmerini refused to attend.

Palmerini took a leave of absence in mid-September of 2010. On September 21, 2010, Palmerini forwarded a note from his psychologist, Dr. Charles Streff, that said that Palmerini found

5

his work experience to be negative and that his experience was
exacerbated by a manager who seemed angry and accused Palmerini
of unprofessional behavior.  Dr. Streff thought that Palmerini
had increased stress and a strong sense of frustration and stated
that he could not see how Palmerini could be productive and
satisfied in that work environment.  Dr. Streff also thought that
it would be better for Palmerini to find work elsewhere.

On September 27, Palmerini provided more information from
Dr. Streff that Palmerini had suffered post traumatic stress
disorder ("PTSD") because of his experience at Fidelity and a
request that Fidelity provided Palmerini a "non-toxic environment
under a different supervisor."  Palmerini testified at his
deposition that in September of 2010 he was physically unable to
go to work because he could not enter the Fidelity building.

In response, Fidelity offered Palmerini the opportunity to
return to his position as an RSR.  The base salary was the same
for both the RSR and RIS positions, although Palmerini believed
the bonus potential was higher in the RIS position.  Palmerini
refused to transfer to the RSR position.  He argued at his
deposition that moving back to his position as an RSR would not
help because he would be "sitting side by side" with the RIS
group and would see his colleagues and Znoj.

Fidelity then offered Palmerini the option of taking an RIS
position under a different manager, James Moran.  Palmerini had
previously praised Moran as a man of "great character and
integrity."  Palmerini accepted the offer and returned to

Fidelity on October 11, 2010. The same day, however, Palmerini informed the human resources department that Moran was harassing him and requested another reassignment. At his deposition, Palmerini said that Moran harassed him by telling him to make more calls and spend less time talking to his peers when he was not talking to his peers, by telling Palmerini he was wandering around and not doing his job without meeting with him, and by calling Palmerini a coward and questioning Palmerini's performance. Palmerini believed that Moran was rude and failed to engage in a dialogue so that Palmerini could be heard and respected. Because Moran called him a coward, Palmerini could no longer work with him and went out on his second leave of absence on October 15, 2010.

During the second leave of absence, Fidelity gave Palmerini the options of returning to his RIS job with Moran as his manager or applying for other jobs within Fidelity. Palmerini applied for eleven other jobs within Fidelity. Dr. Streff confirmed that Palmerini was mentally and physically capable of working. Fidelity did not hire Palmerini for any of those jobs. Palmerini refused to return to his job at RIS under Moran. Palmerini testified at his deposition that he had no knowledge that anyone who reviewed his applications knew that he had been diagnosed with PTSD and depression and testified that he had no knowledge that discrimination was the reason he was not hired.

Palmerini continued to refuse to return to his RIS job, working under Moran. Palmerini told Fidelity in January of 2011

that his experiences with Hash, Znoj, and Moran were comparable to soldiers who fought and were shot at in Iraq and Afghanistan. In February of 2011, he said that for him to return to his RIS job under Moran would be like sending the Chilean miners (who were trapped for sixty-nine days in a mine in 2010) back to an even smaller part of the mine than where they had been trapped. When Palmerini's sixty-day leave of absence expired, Fidelity terminated his employment.

At his deposition, Palmerini explained that he wanted Fidelity to move him into a separate building or separate location away from his RIS colleagues and management team.  He testified that he needed a work environment without negativity and needed to work under managers who engaged in active listening.  Palmerini contends that Fidelity discriminated against him by not providing a work environment that met those criteria.

In December of 2011, Palmerini brought suit against Fidelity in the United States District Court for the District of Massachusetts, alleging claims under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001, et seq., and seeking short term disability benefits.  See Palmerini v. Fidelity Investment Group Employee Short-Term Disability Plan, 11-cv-12282-DPW (D. Mass. December 20, 2011).  Palmerini alleged that he had been diagnosed with PTSD and depressive disorder, not otherwise specified, and that symptoms from those disorders forced him to stop working as of October 15, 2010.  Palmerini

8

also alleged that because of his impairments he was unable to
return to work through the maximum period for short term
disability benefits, 180 days.

Palmerini alleged that he had received short term disability
benefits through October 1, 2010, but further benefits were
denied due to a lack of evidence that Palmerini suffered from a
severe mental illness.  In support of his ERISA claims, Palmerini
alleged that he was disabled within the terms of the STD Plan,
which defined disability to mean that the employee was "unable to
perform the material duties of [his] regular job solely as a
result of accidental injury, sickness, mental illness, substance
abuse or pregnancy . . . ."  Id., Complaint, doc. 1, ¶ 11.  On
July 6, 2012, Fidelity filed a notice of settlement and an
assented-to request for a stay, which was granted.  Fidelity and
Palmerini filed a joint stipulation of dismissal with prejudice
on October 5, 2012.

Palmerini filed this suit against Fidelity on December 20,
2012.


B.  Discussion

Palmerini alleges claims of discrimination in violation of
the ADA, § 12112(b)(5), and negligent and intentional infliction
of emotional distress.  Fidelity moves for summary judgment on
all of the remaining claims or, alternatively, asks the court to
decline supplemental jurisdiction over the state law claims.
Palmerini objects.

1.  <u>ADA Claim</u>

The ADA prohibits discrimination by a covered employer "against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  A qualified individual for purposes of the ADA is someone "who, with or without reasonable accommodation, can perform the essential functions of the employment position that [he] holds or desires."  § 12111(8).  In enacting the ADA Amendments Act of 2008 ("ADAAA"), Congress intended to make the process of determining coverage under the ADA less complex and to lower the standard for determining a disability.  <u>Mazzeo v. Color Resolutions Int'l, LLC</u>, 746 F.3d 1264, 1267 (11th Cir. 2014).

"A plaintiff seeking to establish a prima facie case of disability discrimination under the ADA must show, by a preponderance of the evidence, (1) that [he] was 'disabled' within the meaning of the ADA; (2) that [he] was able to perform the essential functions of [his] job with or without accommodation; and (3) that [he] was discharged or adversely affected, in whole or in part, because of [his] disability."  <u>Jones v. Walgreen Co.</u>, 679 F.3d 9, 14 (1st Cir. 2012) (internal quotation marks omitted).  If the plaintiff makes the required prima facie case, "the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its action."  <u>Id.</u> (internal quotation marks omitted).

a.  Disabled

As used in the ADA, disability means "(A) a physical or
mental impairment that substantially limits one or more major
life activities of such individual; (B) a record of such an
impairment; or (C) being regarded as having such an impairment .
. . ." 42 U.S.C. § 12102(1).  Major life activities involve a
variety of activities which include working, § 12102(2)(A), and
"the operation of a major bodily function," § 12102(2)(B).  In
the ADAAA, Congress instructed that "[t]he definition of
disability in this Act shall be construed in favor of broad
coverage of individuals under this Act, to the maximum extent
permitted by the terms of this Act." § 12102(4)(A).
Accordingly, "[t]he term 'substantially limits' shall be
construed broadly in favor of expansive coverage, to the maximum
extent permitted by the terms of the ADA.  'Substantially limits'
is not meant to be a demanding standard." 29 C.F.R. §
1630.2(j)(1)(i).

Fidelity contends in support of summary judgment that
Palmerini cannot show that he is substantially limited in the
major life activity he claims, working.  Citing the version of
§ 1630.2(j) prior to amendment following the ADAAA, Fidelity
argues that Palmerini cannot show that his depression or PTSD
significantly restricted his ability to do either a class of jobs
or a broad range of jobs.  Because Fidelity relies on outdated

authority, however, that argument is unpersuasive.[2]  See, e.g.,
Crosby v. F.W. Webb, Co., 2014 WL 1268691, at *6-*7 (D. Me. Mar.
26, 2014).


   b.  Ability to Perform Essential Functions of His Job

   Based on Palmerini's ERISA suit, Fidelity contends that
Palmerini cannot show that he was able to perform the essential
functions of his job with or without reasonable accommodation
because he admitted that he could not perform the functions of
his job.  Fidelity also contends that Palmerini rejected the
reasonable accommodations Fidelity offered.  In response,
Palmerini argues that his statements in support of his ERISA suit
do not show that he was unable to perform the essential functions
of his job and that Fidelity did not provide reasonable
accommodation for his disability.


   i. Essential Functions of His Job

   As is noted above, Palmerini alleged in support of his ERISA
suit that he was unable to perform the material duties of his job
from October 1 to October 10, 2010, and from October 16, 2010,
for at least the next 180 days, or until at least the end of
March of 2011, because of his symptoms due to PTSD and depressive
disorder.  In addition, Palmerini sent email to Fidelity during

---

   [2]Fidelity did not pursue the disability issue in its reply
after Palmerini raised the changes wrought by the ADAAA in his
objection.

his second leave of absence in which he stated that returning to work at Fidelity with Moran as his manager or in an RSR position would be like returning the Chilean miners to the mine where they would be wedged in a much smaller tunnel than previously. Palmerini also testified at his deposition that he stopped looking for work because he experienced PTSD flashbacks during interviews.

Based on those statements, Fidelity contends that Palmerini has admitted that he could not perform the essential functions of his job.  For that reason, Fidelity contends, Palmerini cannot prove his ADA claim.

In response, Palmerini argues that his allegations in his ERISA suit are a red herring because the definition of disability in the short term disability plan is not the same as the ADA's definition.  Palmerini also argues that Fidelity must show, but has not shown, that he is bound by res judicata.  Palmerini asserts that he was able to perform the essential functions of a RIS Proactive representative based on evidence of prior good performance at Fidelity.

Fidelity does not rely on the doctrine of res judicata, nor does that doctrine apply to the issue of whether Palmerini admitted that he was unable to do the essential functions of his job at Fidelity through his allegations in the ERISA suit. Instead, Fidelity may have intended to rely on the doctrine of judicial estoppel.  See, e.g., Boston Gas Co. v. Century Indem. Co., 708 F.3d 254, 261 (1st Cir. 2013) ("Judicial estoppel is an

13

equitable doctrine that prevents a litigant from pressing a claim that is inconsistent with a position taken by that litigant either in a prior legal proceeding or in an earlier phase of the same legal proceeding." [internal quotation marks omitted]). Because Fidelity does not identify or develop a legal basis for the weight to attribute to Palmerini's statements in the ERISA suit, those statements do not establish that Palmerini could not do the essential functions of his job.[3]  See Higgins v. New Balance Athletic Shoes, Inc., 194 F.3d 252, 260 (1st Cir. 1999); accord Coons v. Indus. Knife Co., Inc., 620 F.3d 38, 44 (1st Cir. 2010).

Palmerini's other statements do not necessarily establish that he was unable to do the essential functions of his job without reasonable accommodation.

ii.  Reasonable Accommodation

Palmerini claims that Fidelity failed to offer him reasonable accommodation for his disability.  In support, Palmerini relies on a note, dated November 12, 2010, sent by his psychologist, Dr. Streff, to Fidelity.  Dr. Streff recommended that Palmerini be placed "in a comparable position in a healthy

---

[3]Fidelity cites that part of Ruiz Rivera v. Pfizer Pharms., LLC, 521 F.3d 76, 82 (1st Cir. 2008), which provides the reconsideration standard, the summary judgment standard, and a standard for determining whether a plaintiff is regarded as disabled under the ADA.  The cited page does not pertain to the issue of whether Palmerini's allegations in the ERISA case may establish that he is unable to do the essential functions of his job.

environment that will allow and encourage him to use his skill set and experience, separate from the [RIS] and his current leadership team."  Palmerini interprets Dr. Streff's recommendation to mean that he should be allowed to try a position in a physical location other than where his previous managers, Znoj and Moran, were located.

To succeed on his claim, Palmerini bears the burden of showing that Fidelity knew of his disability and "and did not reasonably accommodate it."  Jones v. Nationwide Life Ins. Co., 696 F.3d 78, 89 (1st Cir. 2012).  "An accommodation request must be sufficiently direct and specific, and it must explain how the accommodation is linked to plaintiff's disability."  Id.  In addition, the plaintiff must show that his proposed accommodation would allow him to perform the essential functions of his job and would be feasible for his employer under the circumstances.  Id. at 90.  An essential element is that the plaintiff's requested accommodation is likely to lead to success.  Id.

Fidelity contends that Palmerini's accommodation request was not reasonable because Fidelity had already provided him with two transfers to different managers, which did not solve the problem.  Further, Fidelity notes, Palmerini worked with Moran for only one day before pronouncing that job unacceptable.  After the transfers Fidelity provided did not solve Palmerini's problems, Fidelity granted Palmerini an extended leave to allow him to apply for other positions.  Palmerini testified at his deposition

15

that he could not interview for other positions because his PTSD symptoms returned.

The ADA does not require employers to provide a stress-free work environment or a work environment without aggravation.  See, e.g., Gaul v. Lucent Techs., Inc., 134 F.3d 576, 581 (3d Cir. 1998); Gonzagowski v. Widnall, 115 F.3d 744, 747-48 (10th Cir. 1997) (citing Marino v. U.S. Postal Serv., 1994 WL 224161 (1st Cir. May 27, 1994)); Tomlinson v. Wiggins, 2013 WL 2151537, at *4 (W.D. Ark. May 16, 2013); Frantz v. Shinseki, 2012 WL 259980, at *8 (M.D.N.C. Jan. 27, 2012); Schwarzkopf v. Brunswick Corp., 833 F. Supp. 2d 1106, 1123 (D. Minn. 2011).[4]   Nor is it reasonable to expect an employer to juggle its personnel repeatedly to provide a work environment to the employee's liking.  Gaul, 134 F.3d at 581; Frantz, 2012 WL 259980, at *8; Prichard v. Dominguez, 2006 WL 1836017, at *13 (N.D. Fla. June 9, 2006) (citing cases).

Palmerini has not shown that the accommodation he requested, that he be transferred to a position within Fidelity in a physical location away from his previous work groups and managers, was reasonable.  He also has not shown at least a triable issue, given his history of difficulty with three different managers, that any transfer would have allowed him to do the essential functions of his work.  Therefore, Palmerini has

---

[4]The same standards apply under the Rehabilitation Act and the ADA.  Enica v. Principi, 544 F.3d 328, 338 n.11 (1st Cir. 2008).

not shown that he can make a prima facie case in support of his
ADA claim.

     c.  Discharged or Adversely Affected Because of Disability

     In addition, to make a prima facie case, Palmerini would
have to show that he was discharged or otherwise adversely
affected because of his disability.[5]  Sensing v. Outback
Steakhouse of Fl., LLC, 575 F.3d 145, 157 (1st Cir. 2009).
Fidelity terminated his employment because Palmerini did not
return to work when his leave expired.  Palmerini offers no
evidence that Fidelity terminated his employment because of his
disability rather than because he refused to return to work.

     Instead, Palmerini argues that a factual dispute exists as
to whether he was terminated because he abandoned his job, citing
Sensing, 575 F.3d at 157-59.  In Sensing, the circumstances
surrounding the termination of the plaintiff's employment were
complex.  The plaintiff provided evidence that Outback terminated
her employment while she was requesting that she be allowed to
return to work and after she agreed to Outback's condition that
she undergo an independent medical examination.  Id. at 158.  She
further argued that Outback's failure to contact her with
information about the examination prevented her from satisfying
that condition.  Id.  The court concluded that based on those

_____

     [5]Palmerini applied for eleven other jobs at Fidelity but was
not hired.  He testified at his deposition that he had no
knowledge that the people reviewing his applications knew of his
disability or that discrimination affected those decisions.

circumstances, a factual dispute existed as to whether the
plaintiff had abandoned her job, the reason given for her
termination.  Id. at 159.

Palmerini does not provide evidence to show that he told
Fidelity he was willing to return to work.  Instead, Palmerini
refused to return to his RIS job under Moran and continues to
argue that Fidelity had to provide him a different job in a
physical location away from his other colleagues and managers.
Because that demand was unreasonable and Palmerini refused to
work otherwise, Palmerini has not shown a factual dispute as to
whether he abandoned his job.

### 2.  State Law Claims

Fidelity moves for summary judgment on Palmerini's claims
for negligent and intentional infliction of emotional distress,
arguing that the claims are barred by New Hampshire's workers'
compensation law, RSA chapter 281-A, and that Palmerini cannot
prove either claim.  Alternatively, in the event the court
granted summary judgment on the ADA claim, Fidelity asks the
court to decline supplemental jurisdiction over those claims.
Palmerini defends the claims on the merits and asks that the
court retain jurisdiction over the state law claims.

### a.  Jurisdiction

Under 28 U.S.C. § 1367(c)(3), the court "may decline to
exercise supplemental jurisdiction over a claim . . . if . . .
[it] has dismissed all claims over which it has original

18

jurisdiction . . . ."  Because summary judgment is granted in favor of Fidelity on the ADA claim, the court may decline jurisdiction over the state law claims.  The court is not required to decline jurisdiction, however, and, in the circumstances of this case, will retain jurisdiction over the supplemental claims.  See Delgado v. Pawtucket Police Dep't, 668 F.3d 42, 48 (1st Cir. 2012).

        b.  Workers' Compensation Bar

        Under New Hampshire law, "workers' compensation provides the claimant's exclusive remedy for all claims against an employer or its insurer except for wrongful or constructive discharge."  In re N.H. Dep't of Corrs., 162 N.H. 750, 755 (2011); see also Lacasse v. Spaulding Youth Ctr., 154 N.H. 246, 250-51 (2006). RSA 281-A:8, III, permits former employees to elect common law actions for wrongful termination or constructive discharge in lieu of proceeding under the workers' compensation law.  If a former employee elects to proceed under the workers' compensation law, however, the former employee "shall be deemed to have elected the remedies of this chapter, and to have waived rights to recover damages for such wrongful termination or constructive discharge under common law or other statute."[6]  Id.

_____

        [6]Palmerini applied for workers' compensation benefits under RSA chapter 281-A, thereby electing the remedies of that chapter. He argues, however, that because his claim was not successful, he should be allowed to change course and proceed with claims under common law.  Whether a lack of success under RSA chapter 281-A would eliminate the exclusive remedy bar need not be decided here because Palmerini's claim fail on other grounds.

Fidelity was granted judgment on the pleadings on
Palmerini's claim for wrongful discharge.  Claims for negligent
infliction of emotional distress are barred by RSA chapter 281-A.
Karch v. BayBank FSB, 147 N.H. 525, 530 (2002).  To the extent
claims based on intentional actions by employers might survive
the Workers' Compensation Act bar, see Hudson v. Dr. Michael J.
O'Connell's Pain Care Ctr., Inc., 822 F. Supp. 2d 84, 96 (D.N.H.
2011), Palmerini's claim fails on the merits.

> c.  Intentional Infliction of Emotional Distress

To succeed on a claim for intentional infliction of
emotional distress, a plaintiff must show "that a defendant 'by
extreme and outrageous conduct, intentionally or recklessly
cause[d] severe emotional distress to another.'"  Tessier v.
Rockefeller, 162 N.H. 324, 341 (2011) (quoting Morancy v.
Morancy, 134 N.H. 493, 496 (1991)).  "'[L]iability has been found
only where the conduct has been so outrageous in character, and
so extreme in degree, as to go beyond all possible bounds of
decency, and to be regarded as atrocious, and utterly intolerable
in a civilized community.'"  Tessier, 162 N.H. at 341 (quoting
Mikell v. Sch. Admin. Unit No. 33, 158 N.H. 723, 239 (2009)).

Palmerini contends that the conduct of his RIS manager,
Brian Hash, supports his claim because Hash "monitor[ed] his
every move, question[ed] his work ethic, unjustly criticiz[ed]
his performance, falsely accus[ed] him of mistakes, [and]
alleg[ed] he was a corporate spy."  He further contends that
Christopher Znoj continued the same conduct and also called

Palmerini's ideas silly, accused him of mistakes he had not made, shouted at him, accused him of bothering coworkers, and harshly criticized him.  He contends that James Moran engaged in outrageous behavior by calling Palmerini a coward.  In addition, Palmerini asserts that Fidelity's conduct was "plainly outrageous" when it offered him jobs in which he would be supervised by the same managers.

Palmerini's version of events falls far short of outrageous conduct that would rise to the level of intentional infliction of emotional distress.  In the workplace, false accusations of criminal conduct, defamation, humiliating treatment during an investigation, and failure to conduct an adequate investigation to exonerate the employee do not amount to outrageous conduct that would support an intentional infliction of emotional distress claim.  Soto-Lebron v. Fed. Express Corp., 538 F.3d 45, 60-61 (1st Cir. 2008).  Negative and false performance reviews, abuse of authority, humiliation, and other demeaning actions by an employer failed as a matter of law to show intentional infliction of emotional distress.  Walton v. Nalco Chem. Co., 272 F.3d 13, 19 (1st Cir. 2001).

Therefore, Palmerini has failed to show evidence to support his intentional infliction of emotional distress claim.


    d.  Damages

Palmerini argues in the alternative that he may claim emotional distress damages for wrongful discharge.  Palmerini no

longer has a claim for wrongful discharge.  Therefore, he cannot claim damages based on a claim that has been dismissed.

### Conclusion

For the foregoing reasons, the defendant's motion for summary judgment (document no. 38) is granted.  All claims have been resolved in favor of the defendant.

In light of this order, the defendant's motion for an extension of time, document no. 48, is terminated as moot.

The plaintiff's motion for an extension of time (document no. 42) is granted as provided in this order.  Counsel for the plaintiff, Darlene M. Daniele, shall pay to Fidelity the amount of the attorneys' fees award, $2,823.75, **on or before July 20, 2014**.

The clerk of court shall enter judgment accordingly and close the case.

SO ORDERED.

_Joseph A. DiClerico, Jr._
Joseph A. DiClerico, Jr.
United States District Judge

July 9, 2014

cc:  Darlene M. Daniele, Esq.
     Emily G. Rice, Esq.
     Edward J. Sackman, Esq.